38 F.3d 1215
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Linda J. DAVIS, Plaintiff-Appellant,
v.
SPORTS & RECREATION, INC. Defendant-Appellee.
 No. 93-6132.
 United States Court of Appeals, Sixth Circuit.
 Oct. 24, 1994.
 
 Before: RYAN and BATCHELDER, Circuit Judges; and JOINER, Senior District Judge*
 PER CURIAM.
 
 
 1
 Plaintiff-appellant, Linda J. Davis, appeals the grant of judgment as a matter of law, pursuant to Fed.R.Civ.Pro. 50(a), for the defendant in this case brought pursuant to Tenn.Code Ann. Sec. 50-1-304. Davis claimed that defendant-appellee, Sports & Recreation, Inc. ("Sports"), terminated her for refusing to remain silent about illegal activities, specifically sexual harassment and rape of herself and another female employee of Sports by a Sports store manager. For the reasons that follow, we affirm.
 
 I.
 
 2
 Davis was employed by Sports as an office manager for its Nashville, Tennessee store in April, 1989. In 1990, Tim O'Hara became the manager of the Nashville Store. According to Davis, O'Hara sexually assaulted her on two occasions; however, Davis chose not to report these incidents to management or to file any charges against O'Hara.
 
 
 3
 In October of 1991, approximately ten months after the date of the alleged assaults, Davis called John Nielsen, a former assistant manager of the Nashville store, with whom Davis had a close personal friendship. By then, Davis had learned that another female employee claimed to have been raped by O'Hara, although she had not reported the incident to anyone. Davis told Nielsen about the sexual assaults, and Nielsen urged her to report these incidents to the company through the H.E.L.P. Line.[1] Davis declined to do so.
 
 
 4
 Following the conversation with Davis, Nielsen reported the allegations made by Davis to his regional manager and to another company official in Tampa, Florida. As a result, Gordon Perkins, the Regional Manager for the region which included the Nashville, Tennessee store, and Melinda Smith, Human Resource Manager for Sports, were directed to fly to Nashville to conduct an investigation into Davis's allegations.
 
 
 5
 Perkins and Smith arrived in Nashville on October 16, 1991. They interviewed Davis at an off-site location and had her prepare a handwritten statement detailing her recollection of the alleged assaults. Perkins and Smith also interviewed several other employees in an effort to determine what occurred, and if others had suffered similar treatment. None of the persons interviewed could provide any direct evidence corroborating Davis's claims of assault.
 
 
 6
 Davis was told by Perkins and Smith that this investigation was "confidential" and that she should not discuss it with any other employee. Other employees who were interviewed were apparently given the same instructions. According to Sports, the confidentiality policy was intended to prevent the spreading of rumors within the store in order to protect morale, as well as to protect both the accuser and the accused.
 
 
 7
 Davis testified that she was very concerned that no action was taken by Sports as a result of its investigation. According to Davis, despite her contacting Smith on two or three occasions to learn the outcome of the investigation, she received no report as to their determination. Davis was reportedly told only that "the investigation was continuing" and the evidence obtained was inconclusive.
 
 
 8
 In late March of 1992, Diana Burkhalter, an administrative manager from Sport's Jacksonville, Florida store, was sent to the Nashville store to assist Davis with credit card procedures. While working with Burkhalter, Davis informed her of the incidents with O'Hara, and expressed her frustration that nothing had been done by Sports to punish him. As a result of this conversation, Burkhalter contacted Perkins and asked him why O'Hara had not been terminated. Perkins told her that he could his lose job for even discussing the investigation, but that evidence gathered during the course of the investigation had cast doubt on the veracity of Davis's allegations.
 
 
 9
 After his conversation with Burkhalter, Perkins advised Tom Wirkus, another company official, that it appeared that Davis had violated the company's confidentiality policy, about which she had been advised at the time of the investigation. According to Perkins, he and Wirkus also discussed Davis's allegedly deteriorating job performance. At the conclusion of their discussion, Wirkus advised Perkins that he should terminate Davis.
 
 
 10
 On April 7, 1992, Perkins and store manager, Jeff Binkley, met with Davis in the Nashville store.[2] Perkins reportedly first asked Davis if she remembered being instructed that the investigation of her allegations against O'Hara were confidential and were not to be discussed with other employees. Davis responded that she did and then asked if she was being fired. Perkins told her that she was, and Davis got up and left the store. According to Perkins, Davis's abrupt decision to leave prevented him from being able to discuss Davis's alleged poor job performance, which, according to Sports, was another reason for her termination. However, the termination notice which Davis received stated only that she was being terminated for disregarding company security rules.
 
 
 11
 On April 11, 1992, Davis filed a complaint pursuant to Tenn.Code Ann. Secs. 4-21-101--4-21-903, the Tennessee Human Rights Act, in the Circuit Court for Davidson County, Tennessee. In her complaint, Davis alleged that Sports retaliated against her for filing a complaint with the EEOC. On June 5, 1992, Sports removed the case to federal district court.
 
 
 12
 On December 16, 1992, Davis filed a motion to amend her complaint. The court granted permission, and Davis filed her amended complaint alleging that she was terminated in violation of the Tennessee Public Protection Act, Tenn.Code Ann. 50-1-304. The case was tried to a jury on August 3, 1993. At the end of proof, Sports moved for judgment as a matter of law, which was granted by the court.
 
 II.
 
 13
 When reviewing a motion for judgment as a matter of law, this court's standard of review is identical to that used by the district court. O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994); Marsh v. Arn, 937 F.2d 1056, 1060 (6th Cir.1991). Thus, when reviewing a motion for judgment as a matter of law, this court should not evaluate the credibility of witnesses, weigh the evidence, or substitute its judgment for that of the jury; rather, this court must view the evidence in the light most favorable to the party against whom the motion is made and give that party the benefit of all reasonable inferences. Lewis v. City of Irvine, Ky., 899 F.2d 451, 454-455 (6th Cir.1990). "This court should affirm the granting of the motion 'if there is a complete absence of pleading or proof on an issue or issues material to the cause of action or where there are no controverted issues of fact upon which reasonable men could differ.' " O'Brien, 23 F.3d at 995 (quoting Kitchen v. Chippewa Valley Sch., 825 F.2d 1004, 1015 (6th Cir.1987)).
 
 
 14
 This case was tried on Davis's contention that she was terminated in violation of the Tennessee Public Protection Act, Tenn.Code Ann. Sec. 50-1-304 (1991) (the "PPA"). The PPA, as relevant to Davis's action, provides:
 
 
 15
 (a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
 
 
 16
 (b) As used in this section, "illegal activities" means activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.
 
 
 17
 It is Davis's contention on appeal that her termination was in violation of the PPA because she was terminated for refusing to remain silent about illegal activities that she concluded were being "covered up."
 
 
 18
 The district court, in granting Sports's motion for judgment as a matter of law, stated:
 
 
 19
 First of all, it is essential to look at what this case is not about. This is not a Title Seven suit for sexual harassment. And it is not a case of retaliatory discharge for complaining about sexual harassment. It's not about whether or not--whether Ms. Davis was assaulted by Mr. O'Hara. This is not the question in this case.
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 [T]his case has been narrowed down to the Tennessee Public Protection Act and its application to Ms. Davis's discharge. The only question is whether or not Ms. Davis was fired for, quote, blowing the whistle on an alleged illegal activity of the company, Sports and Recreation, Incorporated.
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 This was not a reporting to management of an illegal act. Even if we consider Ms. Burkhalter to be part of management or in the position superior to that of Ms. Davis--and that is questionable--management already knew about the alleged sexual harassment or assault and the judgment call not to do anything to Mr. O'Hara because they felt the proof to be inconclusive and merely let him off with a warning.
 
 
 26
 That in itself is not [an] illegal act. That is what is being complained to Ms. Burkhalter.
 
 
 27
 * * *
 
 
 28
 * * *
 
 
 29
 This is not to say that Ms. Davis was not abused or didn't tell you and me the absolute truth about it. It is simply saying that the particular method or vehicle she has chosen to vindicate herself in this is not appropriate under these facts.
 
 
 30
 Thus, the district court concluded that the PPA simply did not apply to the facts of Davis's complaint and granted judgment as a matter of law in favor of Sports.
 
 
 31
 After carefully reviewing what little law exists with respect to the PPA, we are constrained to agree with the district court's conclusion that the PPA was simply not the appropriate vehicle for Davis to vindicate her rights.
 
 
 32
 The only case from the Tennessee courts directly interpreting the PPA is Merryman v. Central Parking System, Inc., No. 01A01-9203-CH-00076, 1992 WL 330404, (Tenn.Ct.App. Nov. 13, 1992), an unreported case. In Merryman, the plaintiff was co-captain of a corporate jet. He noticed that his superior's attention span, powers of concentration, and sense of balance were deteriorating. Concluding that this was a danger both to the passengers' lives and the aircraft, Merryman confronted his superior with these observations. Two days later, Merryman was terminated. Merryman brought suit alleging, among other things, that his discharge violated the PPA.
 
 
 33
 The district court granted summary judgment to the defendant, and Merryman appealed. The Court of Appeals of Tennessee affirmed the district court's grant of summary judgment, reasoning that Merryman "was not asked to participate in illegal activities nor was he told not to report such. One of the elements necessary to establish [a claim] pursuant to the Public Protection Act is the refusal to participate in, or to remain silent about, illegal activities." Merryman, 1992 WL 330404 at * 7. This reasoning is directly applicable to the case presently before us now. Reduced to its essentials, Davis's claim is that she was told to remain silent about the investigation into her allegations. She was not told that she could not file an official complaint with the EEOC or other agency, either before or after she communicated the existence of the alleged assaults to Nielsen. As the defendants correctly point out, the alleged incidents by Mr. O'Hara took place in January, 1991. The investigation into these allegations began on October 16, 1991. Thus, Davis received no instructions regarding confidentiality until almost eight months after the alleged incidents, and then she was only instructed not to discuss the incidents or the investigation with other employees. There was nothing implicit or explicit in these instructions to suggest that she could not seek other means of recourse through the legal system.
 
 
 34
 Davis was not terminated until she expressed dissatisfaction with the results of the investigation, to another employee of Sports, in direct contravention of the explicit instructions she had been given concerning confidentiality. As the district court concluded, though Davis might have been unhappy over, or disagreed with, the inconclusive result of Sports's investigation, that result was simply not an "illegal activity"; therefore her failure to remain silent about that result did not bring her within the protection of the PPA.
 
 
 35
 Because there was simply no illegal activity about which Davis was instructed and refused to remain silent, and she therefore cannot prevail under the PPA, we decline to address the other issues raised by the parties in their briefs.
 
 III.
 
 36
 The district court's grant of judgment as matter of law to the defendant is AFFIRMED.
 
 
 37
 JOINER, Senior District Judge, concurring in judgment.
 
 
 38
 The Tennessee Public Protection Act has been the subject of but one case interpreting its provisions. This new statute evidences the state's emphatic policy that employees reporting illegal activities in the workplace be protected from retaliatory discharge. A remedial statute such as this "should be construed liberally to accomplish the objects, correct the evils, and suppress the mischief at which they are aimed." Merryman v. Central Parking Sys., Inc., 1992 WL 330404 at * 5, 1992 Tenn.App. LEXIS 935 at * 16 (Tenn.App. Nov. 13, 1992). Based on all of this, the statute should not be construed in a manner that removes from its protective ambit an employee who, having reported illegality to management, takes her complaint one step further when management allegedly does nothing as a result of its investigation. To distinguish between a report of illegal conduct and a report of management's alleged stonewalling in its investigation of the illegal conduct splits hairs. Worse, it threatens to reward the employer who fends off the efforts of the tenacious employee who is not satisfied with simply reporting illegality, but also is committed to eradicating the offending conduct.
 
 
 39
 Nonetheless, I believe that the district court properly entered judgment on the facts of this case. Davis testified that she informed Burkhalter of the incident with O'Hara and the inconclusive results of the company's investigation in the "hope" that Burkhalter would inquire into the situation. Davis specifically testified that she did not ask Burkhalter to do anything on her behalf. There is nothing to distinguish Davis' conversation with Burkhalter from idle gossip except Davis' testimony about her subjective state of mind. If an employee seeks the benefits of the Public Protection Act, she should undertake to protect the public in some affirmative way by, e.g., requesting assistance, guidance or suggestions in confronting or solving the problem. Put another way, the Public Protection Act was not intended to protect casual conversation and idle gossip, which, on the objective evidence, is all that Davis engaged in with Burkhalter. Thus, I too am in favor of affirming the district court's judgment.
 
 
 
 *
 The Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 Effective January 1, 1991, Sports adopted a sexual harassment policy which was communicated to all employees. As part of this policy, Sports had a toll-free "H.E.L.P. Line" through which employees could report incidents of sexual harassment to company management
 
 
 [2]
 On April 3, 1992, Davis filed a complaint with the Equal Employment Opportunity Commission. It is undisputed, however, that Sports had not received notice of Davis's EEOC filing by April 7, the date of her termination. Summary judgment was granted to Sports on Davis's retaliatory discharge claim, and this issue is not appealed